**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4: 16 CR 00528 AGF |
| | ) | |
| KERRY ROADES, | ) | |
| | ) | |
| Defendant. | ) | |

# SENTENCING MEMORANDUM

NOW COMES Defendant Kerry Roades, by and through appointed counsel Douglas P. Roller, and presents the following Sentencing Memorandum.

## INTRODUCTION

On November 3, 2017, Defendant entered a plea of guilty to Count One of the Indictment pursuant to a Plea Agreement. Defendant's Objections to the PSR were filed on August 10, 2018. As noted in that pleading, however, none of the objections, all of which are factual in nature, affect the Guidelines calculations set forth in the PSR because all pertinent Guidelines calculations were agreed to in the Plea Agreement. Rather, the objections are directed at factual issues which might impact on potential Guidelines mitigating factors and downward departures or downward variances pursuant to 18 U.S.C. 3553. Similarly, the discussion herein will focus on mitigating factors recognized under the Sentencing Guidelines and 18 U.S.C. 3553.

The government has portrayed Kerry as evil and equally culpable for the offense as codefendant Todd Beckman. The information presented herein will establish that Defendant was a hard-working family person who had overcome substantial health and physical abuse issues as a child and had to contend with ongoing medical issues as an adult. Defendant was initially

employed by Todd Beckman in the construction of physical fitness facilities. He became friends with Beckman both through work and from being neighbors. As described by his wife Tricia in attached correspondence, eventually Kerry began to try to distance himself from Beckman because of Beckman's involvement with alcohol and his increasingly bizarre behavior. Nevertheless, when Beckman asked Kerry to give him a ride that November evening, Kerry obliged. The events over the next two days has altered Kerry's life forever.

A person's life and his character cannot be measured by two days of poor judgment. Kerry's pertinent accomplishments during his life and his personal characteristics which have guided him are revealed by both the many letters written on his behalf from family, friends, co-workers and a law enforcement officer, attached hereto, as well as Kerry's conduct since incarcerated, as demonstrated by various accomplishments and courses undertaken as documented in attachments hereto.

The picture of Kerry as a man rather than only as a Defendant will be described by portraying his character and life through applicable Guidelines mitigating provisions and a discussion of his history and characteristics pursuant to Section 3553(a). A review of the circumstances of the offense as they pertain to Kerry pursuant to Section 3553(a) will demonstrate the true nature of Kerry's culpability in the offense.

This Sentencing Memorandum is in three parts: 1) Sentencing Guidelines mitigating factors and grounds for downward departure; 2) Appropriateness of downward variations pursuant to 18 U.S.C. 3553, and; 3) Conclusion and Sentencing Request.

# ANALYSIS

## A. SENTENCING GUIDELINES

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that a federal criminal defendant's Sixth Amendment rights are violated when his or her sentence is increased under the United States Sentencing Guidelines based on the District Judge's determination of a fact (other than a prior conviction) that was not found by the jury or admitted by the defendant. *Id.* at 243-44. As a remedy for the constitutional infirmity presented when the Guidelines mandate a sentence increase based on judge-found facts, the Court severed 18 U.S.C. § 3553(b)(1) from the Sentencing Reform Act of 1984, thereby rendering the Guidelines "effectively advisory." *Id.* at 245.

Following *Booker*, many appellate courts, including the Eighth Circuit, implemented a proportionality test, requiring that a sentence constituting substantial variance from the Guidelines be justified by extraordinary circumstances. However, the Supreme Court in *Gall v. United States*, 532 U.S. 38 (2007), held that the courts of appeals must review all sentences, whether within, outside or significantly outside the Sentencing Guidelines, regardless of the uniqueness of the individual case under a "deferential abuse of discretion standard." The Court set forth the appropriate procedure to be followed by a district court post-*Booker*. The sentencing judge should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.

Amendment 741 to §1B1.1 of the Sentencing Guidelines, effective November 1, 2010, requires the sentencing court to not only calculate the relevant Guidelines sentence, but also determine whether a guidelines departure is available prior to determining whether a "Booker" variance is warranted. This amendment is consistent with Eighth Circuit practice. For example, in *United States v. Hodge*, 469 F.3d 749, 756 (8th Cir. 2006), the Court noted:

> We have made clear post-*Booker* that Guideline departures remain an important and relevant part of determining a defendant's advisory Guidelines range. *See United States v. McDonald*, 461 F.3d 948, 952 (8th Cir.2006) ("The guidelines sentencing range remains the 'critical starting point' of our analysis."); *United States v. Kiertzner*, 460 F.3d 988, 989 (8th Cir.2006) ("[P]ost-*Booker*, ... it is necessary for sentencing courts to calculate the applicable, advisory Guidelines range, ***including any traditional departures or reductions, and use that range as one of the factors under § 3553(a) to determine an overall, reasonable sentence***."); *United States v. Whitrock*, 454 F.3d 866, 868 (8th Cir.2006) ("[A] departure under Chapter 5, Part K is part of the determination of the advisory Guidelines range."). The district court erred in failing to rule on the § 5K1.1 motion prior to considering the § 3553(a) factors. [emphasis added].

As noted previously, the primary Guidelines calculations have been agreed to in the Plea Agreement. Therefore, pursuant to *Hodge*, the Sentencing Guidelines herein will discuss potential reductions and departures applicable to Defendant.

***1. History of Abuse***

As reported in the PSR (¶ 69), Defendant suffered physical abuse as a child, primarily at the hands of his biological father. Although the PSR noted the abuse and that it was verified by Defendant's mother, the extent of the physical abuse is graphically portrayed in the attached letter from Defendant's mother, Virginia Runyan. (Def. Grp. Ex. A at 1-2).[1] Ms. Runyan described how Kerry was mistreated by his biological father, who had a violent temper and was physically abusive to her and her children. Ms. Runyan recalled one incident in which the natural father hit Kerry with a metal pool skimmer and at other times with whatever objects that he could find when he became violent. Ms. Runyan overheard Kerry as a child crying and wondering out load why did his father hate him and why can't Kerry ever please his father. Ms. Runyan divorced Kerry's father.

[1] Letters are grouped by relationship to Defendant. Group A is family; Group B consists of friends and acquaintances; Group C includes co-workers, and Ex. D includes a law enforcement officer; Group E contains various certificates and descriptions of Kerry's conduct since incarceration. Each page in the Group exhibits are numbered for ease of retrieval by the Court.

Ms. Runyan eventually remarried, but the new step father was also abusive. She recalls Kerry began counseling with a doctor at his school due to these problems. The doctor told Ms. Runyan that the step-father's passive/aggressive personality was dangerous for all of them and she should leave before "they were all dead." Ms. Runyan stated that she couldn't leave because she could never support the 4 children by herself at that time. Kerry was beaten by the step-father on multiple occasions, including two which necessitated visits to the ER.

Interestingly, the step-father, also wrote a letter describing Kerry's difficult childhood, including medical and emotional difficulties that Kerry encountered. The step-father even admitted physically abusing Kerry and seldom, if ever, showing affection or approval. (Def. Grp. Ex. A at 3-5).

"It requires no citation of authority to assert that children who are abused generally face extraordinary problems developing into responsible, productive citizens." *Santosky v. Kramer*, 455 U.S, 745, 789 (1982). *See also, United States v. Rivera*, 192 F.3d 81, 84 (2nd Cir. 1999) ("It seems beyond question that abuse suffered during childhood - at some level of severity-can impair a person's mental and emotional conditions"). Therefore, district courts have commonly granted sentencing reductions where a defendant was victimized as a child. *See, e.g. United States v. Patzer*, 548 F.Supp.2d 612 (N.D. Ill. 2008) (imposing 13 years despite Guidelines range of 346-411 months in career offender case, partly in consideration of defendant's difficult childhood with an abusive family and undiagnosed ADHD); *United States v. Ayers*, 971 F.Supp. 1197 (N.D. Ill.1997) (granting departure based upon cruel childhood with relentless physical, sexual and psychological abuse over course of years).

U.S.S.G. §§ 5H1.12 and 5K2.0(d)(1) treat lack of guidance as a youth and circumstances indicating disadvantaged upbringing as forbidden departure grounds. However, *Booker* and its

progeny free district courts to consider these factors as part of their analysis under § 3553(a). *See, e.g., United States v. Samuels*, 2009 WL 875320 (S.D.N.Y. April 2, 2009) (imposing time served sentence rather than the guideline range of 70 to 87 months where defendant was raised under poor economic circumstances with an abusive father addicted to crack); *United States v. Mapp*, 2007 WL 485513 (E.D. Mich. Feb. 9, 2007) (Granting variance based on defendant's upbringing where the frequently witnessed domestic violence and substance abuse by his parents until his grandmother took custody of him at age 5).

This factor is discussed under the umbrella of Guidelines issues because it is specifically discussed in the Guidelines. Furthermore, Defendant submits that his childhood was such that the circumstances were so severe as to not have been taken into account by the Guidelines.

***2. Age and Health Concerns***

Defendant is 57 years old and has never been in prison prior to this case. Recidivism rates decline relatively consistently as age increases, and defendants over the age of 40 exhibit markedly lower rates of recidivism in comparison to younger defendants. *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12, 18. Sentencing courts have recognized this and granted reductions accordingly. *See, e.g., United States v. Saenz-Nunez*, 2011 WL 6013477 (D. N.M. November 28, 2011) (granting four-level downward departure in part because at 53 years old, defendant was less likely to recidivate).; *United States v. Phinney*, 599 F.Supp.2d 1037 (E.D. Wisc. 2009) (sentencing child pornography defendant to six months custody despite Guidelines range of thirty-seven to forty-six months, citing defendant's reduced recidivism potential because of his age as well as health problems).

In addition to his age, Defendant also has substantial health concerns. As noted in the PSR, defendant has suffered from a herniated disc since the age of 18

Defendant also suffered from heart murmurs as a child. Missouri Baptist Center reported Defendant had a hospital stay for severe chest pains and high white blood cell count on September 23, 2000.

Kerry also underwent several back surgeries at the Pada Institute for Pain Management on between October 2013 and March 2015. This is when he was diagnosed with degenerative disc disease

Defendant had a radical prostatectomy to remove cancer on his prostate in August 2009 and continued with follow-up treatments until at least August 2010. Defendant has been prescribed oxycodone and other painkillers[2] by his pain management doctors prior to his incarceration for the instant offense. Additionally, defendant has suffered from kidney stones on a regular basis since the age of 21. (PSR ¶ 73; Def. Grp. Ex. A at A-9)

Finally, Defendant was diagnosed Attention Deficit Hyperactivity Disorder at the age of 11. He was prescribed Adderall at the time and continued to take the medicine until he was incarcerated. Relatedly, Kerry was diagnosed with anxiety disorder in 2014. Defendant was prescribed Xanax, which he continued to take until he was incarcerated. (PSR ¶ 74)

A court may vary or depart downward based on the medical needs of the defendant. *See* U.S.S.G. § 5H1.4 ("An extraordinary physical impairment may be a reason to depart downward"); *United States v. Alemenas*, 553 F.3d 27 (1st Cir. 2009) (varying downward based on defendant's chronic neck pain, and mental and emotional condition); *United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (three years of probation imposed for conspiracy to distribute cocaine rather than

[2] Defendant has abused oxycodone and hydrocodone beginning at age 50. (PSR ¶ 76).

60 month Guidelines term, based on 54 year-old's serious health problems and extraordinary post arrest rehabilitation).

### *3. Post Offense Rehabilitation*

Under prior versions of the guidelines, "post sentencing rehabilitative efforts, even if exceptional, undertaken by a defendant after imposition of a term of imprisonment for the instant offense are not an appropriate basis for downward departure when resentencing the defendant for that offense." U.S.S.G. § 5K2.19 (2011). This section was deleted in 2012. Accordingly, post-offense rehabilitation is an inappropriate mitigating circumstance for courts to consider. *See Pepper v. United States*, 562 U.S. 476 (2011) (holding when a defendant's sentence has been set aside on appeal, the district court may consider evidence of the defendant's post-sentencing rehabilitation); *United States v. Bradstreet*, 207 F.3d 76 (1st Cir. 2000) (departing from 51 to 31 months at resentencing in securities fraud case properly based on post-offense rehabilitation wherein defendant tutored inmates in prison; developed, volunteered, and succeeded in the prison's bootcamp program; began serving as the prison chaplain's assistant; became a program assistant and clerk of the prison parenting program; and lectured at local colleges on ethical perils in business).

Defendant as undertaken an incredible amount of effort while incarcerated toward self-improvement. Attached hereto as Group Exhibit E are certificates of achievement reflecting almost 50 hours of anger management courses (E-1, E-2, E-2A); 48 weeks of substance abuse and life recovery education (E-3, E-4, E-4A, E-4B); he has received Certificates pertaining to five separate religious training courses. (E-5 through E-9). In total, Defendant has taken 83 religious lessons (E-10) and received special recognition for doing so. (E-11),

Mr. Roades also completed four courses given by Restorative Ministries. This program is an educational addictions support and life restoration program sponsored by the United Pentecostal Church, Department of Restorative Ministries. Mr. Roades is also assisting as a guide for new participants and has been commended for these efforts. (E-12, E-13).

Not only has Mr. Roades completed the extensive array of classes described above, but he has also ministered to other inmates, giving them not only religious and spiritual guidance but also life skills education. (E-14). In connection therewith, Kerry prepared a five-page handout which he has distributed to other inmates, containing very practical guidance and tips to develop life skills to enhance the likelihood of successful integration back into society upon release. (E-18 through E-22). For his efforts, Kerry received a Certificate of Appreciation for facilitating a class on "Personal Finance." (E-23, E-24).

**`B. 18 U.S.C. 3553 (a) FACTORS**

Under *Booker*, a sentencing court must still "consider Guidelines ranges," but is now permitted "to tailor the sentence in light of other statutory concerns as well" under § 3553(a). *Id.* at 245-46; *see* 18 U.S.C. § 3553(a). In other words, the Sentencing Reform Act now requires District Courts "to take account of the Guidelines together with other sentencing goals" set forth in § 3553(a). 543 U.S. at 245. Section 3553(a) in turn mandates that a District Court "impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2)…." [Emphasis added.] Section 3553(a)(2) describes those purposes as follows:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendants; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In addition, courts are to consider, *inter alia*, (1) the nature and circumstances of the offense and the history and characteristics of the defendant, *see* § 3553(a)(1); (2) the kinds of sentences available, *see* § 3553(a)(3); (3) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, *see* § 3553(a)(6); and (4) the need to provide restitution to victims, *see* § 3553(a)(7). "[W]ith the mandatory duty to apply the Guidelines excised, the duty imposed by section 3553(a) to 'consider' numerous factors acquires renewed significance." *United States v. Crosby,* 397 F.3d 103, 111 (2d Cir. 2005).

. The sentencing judge must independently evaluate the appropriate sentence considering the §3553(a) purposes and factors and must consider arguments that the Guidelines should not apply on general policy grounds, case-specific grounds or that a different sentence is appropriate "regardless." *Rita v. United States*, 127 S.Ct. 2456, 2464 (2007). In so doing, the judge may not presume that the Guidelines range is reasonable. *Gall*, 128 S.Ct. at 596-597; Rita, 127 S.Ct. at 2465. District Courts are no longer required, or permitted, to simply defer to Sentencing Commission policies. *Rita*, 127 S.Ct. at 2463.

The United States Supreme Court in *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011), reminded us of what the goal of sentencing is:

> "It has been uniform and constant in the federal judicial tradition for ***1240** the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams*, 337 U.S., at 247, 69 S.Ct. 1079; see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts

by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

With this admonition of the Supreme Court in mind, Defendant will bring to the Court's attention facts which warrant a substantial variance from the computed Guidelines sentence. Three of the §3553(a) factors are particularly relevant in this case.

*1.* ***History and Characteristics of Defendant***

The offense in this case is not a ten-year drug conspiracy or an extended, complicated Ponzi scheme, where the defendants engaged in criminal conduct over an extended period. In Kerry's case, the offense conduct occurred over a two-day period.[3] An individual's overall character and personal traits cannot be limited to what occurred in two days out of his 57 years of life. Who Kerry Roades really is, and his personal attributes are described in the multitude of letters written on his behalf and attached hereto as Group Exhibits B and C.

Of course, family members put pen to paper to describe the family member they know so well. *See* Group Exhibit A. Kerry's mother described difficult early years and the trauma he endured at the hands of others. Virginia Runyan outlined the sad saga of two of her boys while describing how Kerry overcame his early childhood travails to become an accomplished mechanic, loving father and cherished husband. (Def. Grp. Ex. A at A-1 through A-2). Karl Runyan, Kerry's step-father wrote a letter that had to have been very difficult to author, taking responsibility for errors he made during Kerry's childhood. Karl also mentioned Kerry's brothers turning to drugs, but that Kerry did not follow in their footsteps. (*Id*. at A-3, A-4).

---

[3] In contrast, Kerry's co-defendants had been engaged in narcotics trafficking for an extended period prior to the kidnapping. Even the kidnapping victim had been involved in drugs.

Your honor is encouraged to carefully read the letter from Tricia Rhodes, Kerry's wife. The person she so graphically portrays is not the same person that the government paints as an evil criminal. Tricia describes how Kerry taught his children to be humble, have compassion, and to listen to others and always try to understand where they're coming from. She describes their children as amazing human beings, both of whom are outstanding students reflecting their family values of community service and a strong work ethic. Importantly, Tricia describes how remorseful Kerry is for the mistakes he has made. She states that no one is more upset than he is with himself. Throughout the period that Kerry has been incarcerated, Tricia notes, he has attended church regularly, mentored to individuals incarcerated with him, giving advice on jobs, obtaining credit, paying taxes and staying away from drugs as well as other life lessons. (*Id*. at A-7 through A-9)

Finally, Tricia disputes the assumption maintained by the government that Kerry and Todd Beckman are close friends. She acknowledges that they did have a close friendship over 20 years ago which led them to go into business together with Todd Beckman hiring Kerry to work for his company. Tricia observed that over the course of years this relationship slowly deteriorated because of poor business deals, personal choices and empty promises. In the past six years the relationship has been extremely strained due to Beckman's personal choices. Kerry no longer desired to be around Beckman outside of work. Kerry tried to get Beckman to enter rehab for his alcohol addiction because of the issue it was becoming at work. Kerry wanted to break away from Beckman, but Todd "always had a way to smooth talk, sell and promise Kerry future success in the company if he would stay…" (*Id*. at A-9).

In addition to family members, several individuals who worked with Kerry or knew him well, some for as long as 20 years or more, wrote letters on his behalf. (*See* Def. Grp. Ex. B and

Def, Grp. Ex. C). Each of these individuals revealed personal experiences they had with Kerry over the years. They describe him as one who was always willing to help, who was devoted to his family and who put others' interest ahead of his own. Some of these individuals also commented on Kerry's medical issues and the impact they have had on his life. Although some of these individuals do not know the details of the offense with which Kerry has been charged, they point out that the character of the person they know is inconsistent with the crime for which Kerry has been charged. For example, Michael Collins states that he knows the type of person Kerry is and, as Collins put it, "I can stay unequivocally that the choices he made last fall are not indicative of the person he is." (Def. Grp. Ex. C at C-7)

Kristen Donahue describes how she and her husband fell on some hard times in the last couple of years and had to claim bankruptcy and even lost their home. Kerry stepped up and helped them get a car and was even willing to buy a house with them and let them pay him rent. Even though he had a busy schedule, Kerry was always available to them to resolve issues pertaining to the store and helping them run the store smoothly. Finally, Kristin noted that she's never heard a person say a negative word about Kerry or his character. (Def. Grp. Ex. B at B-3, B-4).

Others had similar opinions of Defendant. Thus, Jason Durnett observed, "Kerry is a person that will give and help others to the point that it is detrimental to himself." (C-4). Daniel Vale stated that "I've never met anyone more honest or who had more work ethic and drive to become a better person." (B-8). The remaining letters express similar sentiments, portraying a person with character and attributes very different than those the government attempts to create from a lapse of judgment over two days in November.

One individual, Sandra LaPlant, a neighbor of the Roades, made a connection between Kerry's outstanding character traits and the offense to which he has pled guilty by observing:

> When it came to his family and his friends, Kerry was very loyal and protective of them. Great character traits to have in a person. I realize that these same character traits, under special circumstances can have devastating consequences and is why I believe that Kerry found himself in the trouble he is in today.

(B-1).

Jason Valentine has been a police officer for almost 24 years with the last half of his career as a detective. Mr. Valentine has been a neighbor and friend of Kerry and his family for more than 10 years. He points out that he's never written a letter on behalf of a person facing criminal charges. Mr. Valentine wrote, "I feel like I am an extremely good judge of character, having served so many years in law enforcement trying to distinguish between the good people and the bad in our society. I can't stress enough that Kerry is truly one of the good people." (Def. Ex. D).

These letters, from a wide cross-section of individuals, portray Kerry Roades, the man; not, Kerry Roades just the defendant. These letters, more than any words a lawyer can say or write, convey the true character of the person who stands before you for sentencing

***2. Nature and Circumstances of the Offense***

At this point in time, after having sentenced all three codefendants, a lengthy recitation of the nature and circumstances of the offense would be of little additional value to the court. Thus, only the pertinent facts that relate directly to defendant will be briefly recited herein.

Although the government contends that an inference from some telephone conversations between codefendants suggests that Kerry was aware of the kidnapping prior to it having occurred, defendant denies this, and no direct evidence exists to support the government's contention. Defendant's involvement in the offense was by happenstance through Todd Beckman requesting that defendant accompany him on the evening of November 21, 2016. This is the only reason

Kerry was present at the house on that first evening. Kerry readily admits that he should have insisted that the victim be released or have reported the incident to the police. Defendant did not do so because of his business relationship with and economic dependence on Todd Beckman.

Defendant did not participate in any physical abuse of the victim.[4] Defendant did not suggest killing the victim and wrapping him in plastic. Kerry was not present the second evening. Nor was Defendant the individual who accompanied codefendant Beckman to Lowes to obtain various items.

Defendant did go with Beckman and Caleb to access and move the victim's vehicles. At that point, Defendant thought that selling the vehicles would have ended the kidnapping. Subsequently, Defendant learned that it did not. At Beckman's request, Defendant unlocked the gate that provided access to the trailer to which the victim was transferred.

Defendant acknowledges and accepts that his participation as described above made him a co-conspirator in the kidnapping scheme. However, Defendant was not involved in the drug trafficking which gave rise to the dispute and the subsequent kidnaping. Defendant's involvement resulted from his relationship with Todd Beckman and his reluctance to incur Beckman's wrath by reporting the incident to police.

***3. Unwarranted Sentencing Disparity***

Another factor to be considered under §3553(a) is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Some courts have interpreted section 3553(a)(6) to only refer to disparity in sentences across judges and districts, not among defendants in the same case. *See e.g. United States v. Pisman*, 443

[4] Defendant notes that only Caleb testified that he believed Todd may have hit the victim. Blake did not recall Defendant striking the victim. Neither brother recalls Kerry being present the second night.

F.3d 726 (7th Cir. 2006). Other courts have found that such broad-based comparison based on national averages is unreliable and essentially meaningless. *See e.g. United States v. Willingham*, 497 F.3d 541 (5th Cir. 2007). Courts in the Eighth Circuit have compared sentences from other cases in the particular District (*See e.g. United States v. Beiermann*, 599 F.Supp. 2d 1087, 1114-1117 (N.D. Iowa 2009)) as well as between co-defendants in the same case (*See, e.g. United States v. Crumley*, 528 F.3d 1053, 1068 (8th Cir. 2008)).

What is important is that 3553(a)(6) does not preclude all sentence disparities, but only those which are unwarranted. As a general matter, disparity between the sentence of a defendant who did not cooperate with the government and one who did cooperate or between a defendant who accepted responsibility and one who went to trial does not alone give rise to an unwarranted disparity of sentence. *United States v. Brunken*, 581 F.3d 635, 638 (8th Cir. 2009). Each case is different and must be determined on its particular facts.

In the present case, Todd Beckman was sentenced to 240 months; Blake Laubinger received a sentence of 78 months; Caleb Laubinger received a 70-month sentence, and; Zachary Smith received a 15-month sentence. Although the government suggests that Defendant is of equal culpability as Todd Beckman, the facts simply do not support such a conclusion. Caleb and Blake Laubinger were engaging in narcotics trafficking under the specific direction and with the resources of Todd Beckman. Absolutely no evidence exists that Defendant was actively involved in the narcotics operation run by Beckman. It was Beckman's idea to kidnap the victim. Blake and Caleb Laubinger physically kidnapped the victim and were responsible for restraining him for three days. Caleb and Blake as well as Todd Beckman physically abused the victim including dry firing a gun against the victim's head. Defendant had no role in these activities, the ransom demands, or collection of the actual ransom.

## CONCLUSION

Defendant respectfully submits that when the previously enumerated mitigating Guidelines provisions and the above-described Section 3553(a) factors are considered, a sentence imposed on Defendant sufficient, but not greater than necessary, to meet the objectives of Section 3553 would be no more than, at most, between 60 and 84 months incarceration. Such a sentence would reflect the seriousness of the offense and provide deterrence to others.

Respectfully submitted,

/s/ Douglas P. Roller
Douglas P. Roller MO50262
Roller Law Office, LLC
325 N. Kirkwood Road – Suite G5
Kirkwood, Missouri, 63122
(314) 368-6368
d.roller@rollerlawofficellc.com

***Attorney for Defendant Kerry Roades***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 20th day of August 2018, the foregoing was filed electronically with the Clerk of Court and was served by operation of the Courts electronic filing system and by email on counsel of record.

/s/ Douglas P. Roller